WO

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Arizona State Legislature,<br><br>               Plaintiff,<br><br>v.<br><br>Arizona Independent Redistricting Commission, et al.,<br><br>               Defendants. | No. CV-12-01211-PHX-PGR-MMS-GMS<br><br>**ORDER** |

**Order by Snow. J.**

       This three-judge statutory court has jurisdiction pursuant to 28 U.S.C. § 2284(a). Pending before it are Defendants' Motion to Dismiss for Failure to State a Claim (Doc. 16), Plaintiff's Motion for Preliminary Injunction (Doc. 33), and Defendants' Motion to

Dismiss for Lack of Jurisdiction for Lack of Standing (Doc. 43). For the following reasons, Defendants' Motion to Dismiss for Lack of Jurisdiction is denied, Defendants' Motion to Dismiss for Failure to State a Claim is granted, and Plaintiff's Motion for Preliminary Injunction is denied as moot.

## BACKGROUND

From the first year of its statehood in 1912 until 2000, the Arizona State Legislature ("Legislature") was granted the authority by the Arizona Constitution to draw congressional districts, subject to the possibility of gubernatorial veto. In 2000, Arizona voters, through the initiative power, amended the state Constitution by passing Proposition 106. Proposition 106 removed congressional redistricting authority from the Legislature and vested that authority in a new entity, the Arizona Independent Redistricting Commission ("IRC"). Ariz. Const. art. IV, pt. 2, § 1. Proposition 106 prescribes the process by which IRC members are appointed and the procedures the IRC must follow in establishing legislative and congressional districts. Once this process is complete, the IRC establishes final district boundaries and certifies the new districts to the Secretary of State. *Id.* at ¶¶ 16–17.

Under the IRC redistricting process, the legislative leadership may select four of the five IRC members from candidates nominated by the State's commission on appellate court appointments. The highest ranking officer and minority leader of each house of the legislature each select one member of the IRC from that list. *Id.* at ¶¶ 4–7. The fifth member, who is the chairperson, is chosen by the four previously selected members from the list of nominated candidates. The governor, with the concurrence of two-thirds of the senate, may remove an IRC member for substantial neglect of duty or other cause. *Id*. at ¶ 10. The IRC is required to allow a period for public comment after it advertises a draft of its proposed congressional map during which it must review any comments received from either or both bodies of the Legislature. *Id.* at ¶ 16.

On January 17, 2012, the IRC approved a final congressional map to be used in all congressional elections until a new IRC is selected in 2021 and completes the

redistricting process for the next decade. Ariz. Const. art. IV, pt. 2, § 1 ¶¶ 5, 17.

On June 6, 2012, the Legislature filed the present suit against the IRC, its current members, and the Arizona Secretary of State. (Doc. 1.) In its First Amended Complaint, the Legislature seeks a judgment declaring that Proposition 106 violates the Elections Clause of the United States Constitution by removing congressional redistricting authority from the Legislature and that, as a result, the congressional maps adopted by the IRC are unconstitutional and void. (Doc. 12 at 9.) The Legislature also asks the Court to permanently enjoin Defendants from adopting, implementing, or enforcing any congressional map created by the IRC, beginning the day after the 2012 congressional elections. (*Id.*) Defendants move to dismiss on the grounds that Plaintiff fails to state a claim (Doc. 16) and lacks standing to bring this action (Doc. 43). Plaintiff moves for a preliminary injunction. (Doc. 33.) The Court held a consolidated hearing before a three-judge panel on these motions on January 24, 2014.

## DISCUSSION

### I. Legal Standard

Rule 12(b)(6) is designed to "test[] the legal sufficiency of a claim." *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). While "a complaint need not contain detailed factual allegations . . . it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "However, conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. FDIC*, 139 F.3d 696, 699 (9th Cir. 1998). Here, none of the essential facts of Plaintiff's claim are subject to dispute. The parties dispute only the proper legal interpretation of the Elections Clause of the United States Constitution, in light of Supreme Court precedent.

### II. Plaintiff's Claim is Justiciable and Not Barred by Laches or by State Law

As preliminary matters Defendants assert that: (1) Plaintiff lacks standing to bring its First Amended Complaint (Doc. 43), (2) Plaintiff's claims should be barred by the

doctrine of laches (Doc. 16 at 11), and (3) Plaintiff's First Amended Complaint presents a non-justiciable political question (Doc. 37 at 13). Finally, the Amici assert that this claim is barred by the Arizona Voter Protection Act. (Doc. 42.)

Plaintiff has standing to bring the present action. It has demonstrated that its loss of redistricting power constitutes a concrete injury, unlike the "abstract dilution of institutional legislative power" rejected by the Supreme Court as a basis for legislature standing. *Raines v. Byrd*, 521 U.S. 811, 826 (1997) (holding that members of Congress lacked standing to challenge the constitutionality of the Line Item Veto Act). Here, Proposition 106 resulted in the Legislature losing its authority to draw congressional districts even if it retains some influence over the redistricting process via other means. In addition, prior Supreme Court precedent strongly suggests that the Plaintiff has suffered a cognizable injury. The Court has twice entertained challenges raised by state officials under the Elections Clause. *See Smiley v. Holm*, 285 U.S. 355 (1932); *Davis v. Hildebrant*, 241 U.S. 565 (1916). In neither did the Court refuse to address the merits for lack of standing.

Nor does laches bar the present action, at least at this stage of the litigation. To establish laches, a "defendant must prove both an unreasonable delay by the plaintiff and prejudice to itself." *Evergreen Safety Council v. RSA Network Inc.*, 697 F.3d 1221, 1226 (9th Cir. 2012) (quoting *Couveau v. Am. Airlines, Inc.*, 218 F.3d 1078, 1083 (9th Cir. 2000)). "[A] claim of laches depends on a close evaluation of all the particular facts in a case" and thus is rarely appropriate for resolution at the motion to dismiss phase. *Kourtis v. Cameron*, 419 F.3d 989, 1000 (9th Cir. 2005) *abrogated on other grounds by Taylor v. Sturgell*, 553 U.S. 880 (2008). In addition, courts are hesitant to apply laches against state entities or agencies to the extent that it would limit a full exploration of the public interest, or governmental or sovereign functions. *See United States v. Ruby Co.*, 588 F.2d 697, 705 (9th Cir. 1978); *Mohave Cnty. v. Mohave-Kingman Estates, Inc.*, 120 Ariz. 417, 421, 586 P.2d 978, 982 (Ariz. 1978). Further, "it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections

are conducted under [an] invalid plan." *Reynolds v. Sims*, 377 U.S. 533, 585 (1964).

In asserting the defense of laches at this stage, "the defendant must rely exclusively upon the factual allegations set forth in the complaint." *Kourtis*, 419 F.3d at 1000. Here, it is unclear based on the facts set forth in the complaint whether Plaintiff's delay in filing this action was unreasonable or whether or to what extent Defendants were prejudiced by this delay. Thus, Defendants have failed to establish a laches claim sufficient to prevail on a motion to dismiss.

Additionally, as will be further explained below, the Court is not barred from determining whether the Elections Clause of the United States Constitution, U.S. Const, art. I § 4, prohibits state voters from amending the Arizona Constitution to place the congressional re-districting function in the IRC. To the extent, however, that the Legislature makes arguments that the IRC cannot be the repository of legislative authority because it is not a representative body, such arguments arise under the republican guarantee clause of the Constitution and, as such, are not justiciable. *Ohio ex. rel. Davis v. Hildebrant*, 241 U.S. 565, 569 (1916) (citing *Pacific States Teleph. & Teleg. Co. v. Oregon*, 223 U.S. 118 (1912)).

Finally, the Amici assert that this action is barred by the Arizona Voter Protection Act ("VPA") which states that the Legislature "shall not have the power to repeal an initiative measure approved by a majority of the votes cast" and "shall not have the power to amend an initiative measure . . . unless the amending legislation furthers the purposes of such measure and at least three-fourths of the members of each house . . . vote to amend such measure." Ariz. Const., art. IV, pt.1, § 1, ¶¶ 6(B) - (C), The Amici argue that this suit is barred because both houses of the Legislature authorized filing this action, and thus it constitutes legislative action to repeal Proposition 106. (Doc. 42 at 8.) However, the text of the VPA clearly refers to the Legislature passing a bill to repeal or amend a duly approved initiative matter, not the filing of a lawsuit that asserts such an initiative is invalid as it violates the United States Constitution. Thus, Plaintiff's action is not barred by the VPA.

### III. The Elections Clause Does Not Prohibit Arizona From Using Its Lawmaking Process to Give Congressional Redistricting Authority to the IRC

No material facts related to the merits of this lawsuit are in dispute. Neither party contests that, since its inception, the Arizona Constitution has reserved the initiative power to its people. Neither party contests that the initiative power is a legislative power. Ariz. Const. art. IV, pt.1, § 1(1) ("[T]he people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature . . . .").[1] Neither party contests that the people of Arizona used that legislative power to create the IRC. Neither party contests that the IRC is a separate entity from the Legislature. Neither party can effectively contest that in fulfilling its function of establishing congressional and legislative districts, the IRC is acting as a legislative body under Arizona law. *Ariz. Minority Coal. for Fair Redistricting v. Ariz. Indep. Redistricting Comm'n*, 220 Ariz. 587, 594–95, ¶ 19, 208 P.3d 676, 683–84 (2009). Neither party contests the Legislature's role in selecting the members of the IRC, or in suggesting modifications to the IRC's redistricting plan.

What the parties dispute is the meaning of the Elections Clause of the United States Constitution. That clause states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const, art. I, § 4, cl.1.

Plaintiff asserts that because the word "legislature" means "the representative body which makes the laws of the people," (Doc. 12 at ¶ 37), and the Clause allows the legislature to prescribe the time, place and manner of holding elections for congresspersons, the Clause specifically grants the power to realign congressional

---

[1] In addition, the initiative power is contained within article IV, the legislative article of the Arizona Constitution. This was also the case with the provisions at issue in *Brown*, *Hildebrant*, and *Smiley*, discussed below. *Smiley v. Holm*, 285 U.S. 355, 363 (1932); *Hildebrant*, 241 U.S. at 566; *Brown v. Sec'y of State of Fla.*, 668 F.3d 1271, 1279, n.7 (11th Cir. 2012).

districts to the legislature.[2] The Supreme Court, however, has at least twice rejected the notion that when it comes to congressional redistricting the Elections Clause vests only in the legislature responsibilities relating to redistricting. Both cases found that states were not prohibited from designing their own lawmaking processes and using those processes for the congressional redistricting authorized by the Clause. In subsequent cases, the Supreme Court has reaffirmed that a state can place the redistricting function in state bodies other than the legislature.

In the first case, *Ohio ex. rel. Davis v. Hildebrant*, the Ohio state constitution reserved to its voters the legislative power to approve or disapprove by popular vote any law passed by the state legislature. 241 U.S. 565, 566 (1916). Ohio voters used this referendum power to disapprove of a congressional redistricting plan drawn by the state legislature. *Id.* In response, a mandamus action was brought against state election officials to direct them to disregard that vote and proceed as if the redistricting plan passed by the legislature remained valid. *Id.* The petitioner's argument was "based upon the charge that the referendum vote was not and could not be part of the legislative authority of the state, and therefore could have no influence on the subject of the law creating congressional districts." *Id.* at 567. Specifically, the petitioner argued that to allow the referendum to block the legislature's plan would violate both the Elections Clause and the controlling act of Congress. *Id.* The State Supreme Court "held that the provisions as to referendum were a part of the legislative power of the state, made so by the [state] Constitution, and that nothing in the act of Congress of 1911, or in the constitutional provision, operated to the contrary, and that therefore the disapproved [redistricting] had no existence and was not entitled to be enforced by mandamus." *Id.*

In reviewing this decision, the United States Supreme Court first looked to the power of the state and explained that "the referendum constituted a part of the state

---

[2] It is not clear if any court has explicitly decided that the "Time, Places and Manner of holding Elections" includes authority to conduct congressional redistricting. However, Supreme Court precedent has assumed this authority is included within the Clause, without undertaking a detailed textual analysis of the question. *See, e.g., Smiley v. Holm*, 285 U.S. 355 (1932); *Ohio ex. rel. Davis v. Hildebrant*, 241 U.S. 565 (1916).

1  Constitution and laws, and was contained within the legislative power," and thus the
2  claim that the rejected plan nonetheless remained valid despite the referendum was
3  "conclusively established to be wanting in merit." *Id.* at 568.

4  Next, the Court looked to how Congress had spoken on the issue under its own
5  Elections Clause power to make or alter state regulations, remarking that the act of 1911
6  had "expressly modified the phraseology of the previous acts relating to [redistricting] by
7  inserting a clause plainly intended to provide that where, by the state Constitution and
8  laws, the referendum was treated as part of the legislative power, the power as thus
9  constituted should be held and treated to be the state legislative power for the purpose of
10 creating congressional districts by law." *Id.* at 568. The Court noted that while the earlier
11 federal statute relating to apportionment had described redistricting by "the legislature"
12 of each state, the 1911 act modified this language, describing redistricting be done by
13 states "in the manner provided by the laws thereof." *Id.* The Court further noted that "the
14 legislative history of this [1911 act] leaves no room for doubt that the prior words were
15 stricken out and the new words inserted for the express purpose, so far as Congress has
16 power to do it, of excluding" the argument made by petitioner. *Id.* at 568–69.

17 Finally, the Court considered whether the act of 1911 may itself have violated the
18 Elections Clause. In doing so the Court declined to hold that the Clause granted
19 redistricting authority uniquely to the state legislature as opposed to any other entity,
20 including the people, which the state may have endowed with "legislative power." Thus
21 the Court observed that the argument that Congress had violated the Elections Clause by
22 authorizing re-districting to be accomplished "in the manner provided by the laws [of the
23 state]" including referendum as it had been used in Ohio to reject the legislature's
24 redistricting map, "must rest upon the assumption that to include the referendum in the
25 scope of the legislative power is to introduce a virus which destroys that power, which in
26 effect annihilates representative government." *Id.* at 569. The Court further noted that the
27 question of whether legislative procedures such as the referendum that Ohio had adopted
28 violated the republican guarantee clause "presents no justiciable controversy." *Id.* (citing

1  *Pacific States Teleph. & Teleg. Co. v. Oregon*, 223 U.S. 118 (1912)).

2  Had the Court interpreted the Elections Clause as requiring that redistricting
3  authority was vested uniquely in the legislature as opposed to giving the states discretion
4  of where to place such authority within the scope of the "state's legislative power," there
5  would have been no need for the Court to hold that the question of granting the people of
6  Ohio the right to participate in congressional redistricting through the referendum power
7  was not justiciable. Thus, in affirming the State Supreme Court's denial of the writ of
8  mandamus in favor of the validity of the referendum, the Court necessarily held that to
9  the extent that the Elections Clause vested some constitutional authority in a state to re-
10 district national congressional districts, that authority was vested in the operation of a
11 state's legislative power; not necessarily in the state legislature. It further held that
12 questions as to whether the exercise of democratic forms of legislative authority violated
13 the Guarantee Clause were political questions to be directed to Congress and not to the
14 Courts. *Id.*

15 Sixteen years later, the Court considered this same question in the context of a
16 gubernatorial veto. *Smiley v. Holm*, 285 U.S. 355 (1932). In *Smiley*, the Minnesota
17 legislature approved a redistricting plan and, as permitted under the Minnesota
18 constitution, it was vetoed by the Governor. The Secretary of State asserted that the
19 legislature had the sole authority to redistrict under the Elections Clause and thus its map
20 was valid despite the veto. *Id.* at 362–63. The State Supreme Court agreed, and held that
21 in exercising the redistricting power which had been conferred upon it by the Elections
22 Clause, the legislature was not exercising a legislative power. *Id.* at 364. Rather it was
23 acting as an agent of the federal government with federal power delegated to it by the
24 Elections Clause to redistrict the federal congressional districts within the state. *Id.*
25 Because the Constitution's delegation was of federal power, the state court held that it did
26 not constitute state legislative power, and the legislature's redistricting decision was thus
27 not subject to gubernatorial veto, as were other state legislative acts. *Id.* at 364–65.

28 The United States Supreme Court rejected this holding. It explained that "[t]he

1  question then is whether the provision of the Federal Constitution . . . invests the
2  Legislature with a particular [federal] authority . . . and thus renders inapplicable the
3  conditions which attach to the making of state laws." *Id.* at 365.  It noted that the function
4  to be performed under the Elections Clause is to prescribe the time, place and manner of
5  holding elections. "As the authority is conferred for the purpose of making laws for the
6  state, it follows, in the absence of an indication of a contrary intent, that the exercise of
7  the authority must be in accordance with the method which the state has prescribed for
8  legislative enactments." *Id.* at 367. The Court found "no suggestion in the federal
9  constitutional provision of an attempt to endow the Legislature of the state with power to
10 enact laws in any manner other than that in which the Constitution of the state has
11 provided that laws shall be enacted." *Id.* at 367–68. Thus, the use of a gubernatorial veto
12 "is a matter of state polity" that the Elections Clause "neither requires nor excludes." *Id.*

13       The Court went on to explain that while "[g]eneral acquiescence cannot justify a
14 departure from the law," "long and continuous interpretation in the course of official
15 action under the law may aid in removing doubts as to its meaning." *Id.* at 369. Here, "the
16 terms of the constitutional provision furnish no such clear and definite support for a
17 contrary construction as to justify disregard of the established practices in the states."  *Id.*
18 The Court then described its earlier opinion in *Hildebrant*, explaining that "it was
19 because of the authority of the state to determine what should constitute its legislative
20 process that the validity of the requirement of the state Constitution of Ohio, in its
21 application to congressional elections, was sustained." *Id.* at 372. Looking to Minnesota's
22 use of the gubernatorial veto, "[i]t clearly follows that there is nothing in [the Elections
23 Clause] which precludes a state from providing that legislative action in districting the
24 state for congressional elections shall be subject to the veto power of the Governor as in
25 other cases of the exercise of the lawmaking power." *Id.* at 372–73. The Court upheld the
26 use of the veto and reversed the state court. *Id.*

27       *Hildebrant* and *Smiley* thus demonstrate that the word "Legislature" in the
28 Elections Clause refers to the legislative process used in that state, determined by that

state's own constitution and laws. Other Courts have arrived at the same conclusion. "The Supreme Court has plainly instructed . . . that this phrase ['the Legislature'] encompasses the entire lawmaking function of the state." *Brown v. Sec'y of State of Fla.,* 668 F.3d 1271, 1278-79 (11th Cir. 2012).

The Supreme Court has further made clear that, in appropriate instances, a state court has authority to formulate a congressional redistricting plan. In reinstating an interim congressional redistricting plan that was ordered by a state court to correct flaws in a legislative redistricting plan, the Supreme Court reaffirmed that a state may place the redistricting authority in entities other than the legislature. "We say once again what has been said on many occasions: reapportionment is primarily the duty and responsibility of the State through its legislature ***or other body,*** rather than of a federal court." *Growe v. Emison*, 507 U.S. 25, 34 (1993) (quoting *Chapman v. Meier*, 420 U.S. 1, 27 (1975)) (emphasis added). *See also Scott v. Germano*, 381 U.S. 407, 409 (1965) (per curiam) (holding in a state reapportionment case that "[t]he power of the judiciary of a State to require valid reapportionment or to formulate a valid redistricting plan has not only been recognized by this Court but appropriate action by the States in such cases has been specifically encouraged.")

The Arizona Constitution allows multiple avenues for lawmaking and one of those avenues is the ballot initiative, as employed here through Proposition 106. Plaintiff notes that the ballot initiative is not one of the four constitutionally-defined processes by which the Legislature itself may enact laws (Doc. 17 at 11), but it cannot dispute that the Arizona Constitution specifies that the initiative power is legislative. Ariz. Const. art. IV, pt. 1, § 1, ¶ 1 ("The legislative authority of the state shall be vested in the legislature, consisting of a senate and a house of representatives, but the people reserve the power to propose laws and amendments to the constitution and to enact or reject such laws and amendments at the polls, independently of the legislature."). *Cf. Brown,* 668 F.3d at 1279 ("Like the veto provisions at issue in *Hildebrandt* and *Smiley,* Florida's citizen initiative is every bit a part of the state's lawmaking function.").

The Legislature argues that the IRC cannot constitute "the Legislature" as that term is used in the Elections Clause, because the IRC is not a representative body. As *Hildebrant* and *Smiley* both demonstrate, however, the relevant inquiry is not whether Arizona has uniquely conferred its legislative power in representative bodies, it is whether the redistricting process it has designated results from the appropriate exercise of state law. There is no dispute that the IRC was created through the legislative power reserved in the people through the initiative with the specific purpose of conducting the redistricting within the state, and that in exercising its functions the IRC exercises the state's legislative power. *Ariz. Minority Coal.,* 220 Ariz. at 597, ¶ 19, 208 P.3d at 683–84. To the extent that this argument is a veiled assertion that the IRC violates the Guarantee Clause, the argument is not justiciable. *Hildebrant*, 241 U.S. at 569 (citing *Pacific States Teleph. & Teleg. Co. v. Oregon*, 223 U.S. 118 (1912)). Similarly unjusticiable is any argument that the people's exercise of their initiative power in the re-districting setting is not a republican exercise of legislative power.[3]

Plaintiff attempts to distinguish this case from *Hildebrant* and *Smiley.* Plaintiff apparently recognizes, in light of *Hildebrant* and *Smiley,* that the Elections Clause does not give unique authority to state legislatures to conduct redistricting. It nevertheless asserts that Arizona has gone too far in excluding the Legislature from congressional redistricting, as opposed to merely placing checks on that power. It argues, without setting forth any authority that would establish such constitutional limits, that "[n]o state can constitutionally divest its Legislature entirely of the redistricting authority conveyed by Article I, Section 4." (Doc. 12 at ¶ 38.) This argument is inconsistent with the Court's observations in *Growe* that states can place redistricting authority in other state entities

---

[3] The Legislature also includes within its briefing citations to the debates at the Constitutional Convention, and other historical materials, to illustrate that the Framers knew the difference between the legislature and the people. Nevertheless such citations arise from other contexts and do not shed any particular light on the present question. As the court in *Brown* observed, "[t]he Framers said precious little about the first part of the Clause, and they said nothing that would help to resolve the issue now before us: what it means to repose a State's Elections Clause power in "the Legislature thereof." *Brown*, 668 F.3d at 1276. None of the legislative history provided by the Legislature in this case changes the *Brown* Court's assessment.

1  and appears to be primarily based on dicta in *Brown*. But, in that case, as opposed to this
2  one, Florida voters had only used their initiative power to create binding instructions for
3  the legislature to follow in its congressional redistricting. 668 F.3d at 1273. They did not
4  vest the primary redistricting responsibility in another state entity. Thus, the *Brown*
5  Court observed that in the case of the Florida initiative, the standards imposed on the
6  legislature did not go so far as to "effectively exclude the legislature from the
7  redistricting process." *Id.* at 1280.

8  Nevertheless, that dicta does not apply to the present case or flow from the
9  analysis adopted in *Hildebrant* and *Smiley*. *Brown* recognized as much. Those cases
10 make it clear that the relevant inquiry is not what role, if any, the state legislature plays in
11 redistricting, but rather whether the state has appropriately exercised its authority in
12 providing for that redistricting. As the Supreme Court stated in *Smiley,* the Elections
13 Clause includes no "attempt to endow the Legislature of the state with power to enact
14 laws in any manner other than that in which the Constitution of the state has provided that
15 laws shall be enacted." 285 U.S. at 367–68. Thus, the Elections Clause does not prohibit
16 a state from vesting the power to conduct congressional districting elsewhere within its
17 legislative powers. The *Brown* Court also adopted this analysis, explaining that the
18 Supreme Court's decisions in *Hildebrant* and *Smiley* "provided a clear and unambiguous
19 answer . . . twice explaining that the term 'Legislature' in the Elections Clause refers not
20 just to a state's legislative body but more broadly to the entire lawmaking process of the
21 state." 668 F.3d at 1276.[4]

22 In Arizona the lawmaking power plainly includes the power to enact laws through
23 initiative, and thus the Elections Clause permits the establishment and use of the IRC.
24 Therefore,

25 **IT IS ORDERED THAT** Defendants' Motion to Dismiss for Failure to State a

---

[4] Arizona has not entirely divested the legislature of any redistricting power. The Legislature retains the right to select the IRC commissioners, and the IRC is required to consider the Legislature's suggested modifications to the draft maps. Ariz. Const. art. IV, pt. 2, § 1 ¶¶ 6, 10, 16.

Claim (Doc. 16) is **granted**.

**IT IS FURTHER ORDERED THAT** Defendants' Motion to Dismiss for Lack of Jurisdiction for Lack of Standing (Doc. 43) is **denied**.

**IT IS FURTHER ORDERED THAT** Plaintiff's Motion for Preliminary Injunction (Doc. 33) is **denied as moot**.

Dated this 21st day of February, 2014.

I certify that Circuit Judge Mary M. Schroeder concurs with this Order.

*A. Murray Snow*
G. Murray Snow
United States District Judge

**Rosenblatt, District Judge**, concurring in part and dissenting in part:

I concur with the majority's conclusions that the present action is justiciable, that Plaintiff has standing to bring it, and that Plaintiff's claims are not barred by the Arizona Voter Protection Act, and I join in those portions of the majority's opinion. I also concur with the majority's conclusion that Plaintiff's action is not barred by the doctrine of laches, although I believe that the issue can be resolved simply on the ground that laches cannot be appropriately applied to bar this action, no matter its procedural stage, given the public's overriding interest in having the Elections Clause issue litigated and resolved.

I respectfully dissent, however, from the majority's conclusion that the Elections Clause permits Arizona to use its lawmaking process to divest Plaintiff of its redistricting authority in the manner adopted by Proposition 106. I believe that the extent of Arizona's delegation of redistricting authority to the Independent Redistricting Commission ("IRC") extends beyond the state's constitutional authority to do so, and I would declare that Proposition 106 violates the Elections Clause, art. 1, § 4, cl. 1 of the United States

Constitution and that the congressional maps adopted by the IRC under that unconstitutional authority are null and void, and I would enjoin their use.

States have the authority to regulate the mechanics of congressional elections only to the extent delegated to them by the Elections Clause. *Cook v. Gralike*, 531 U.S. 510, 522–23 (2001). Among the powers constitutionally delegated to them is the primary responsibility for the apportionment of their congressional districts. *Growe*, 507 U.S. at 34. The Elections Clause mandates that the times, places, and manner of holding congressional elections "shall be prescribed in each State by the Legislature thereof[.]" It cannot be disputed that the Elections Clause's reference to "the Legislature," as that term has been interpreted by the Supreme Court, refers to the totality of a state's lawmaking function as defined by state law, and that in Arizona a citizen initiative, such as that used to enact Proposition 106 to amend the state constitution, is an integral part of the state's legislative process. But the fact that Arizona has appropriately used its initiative process to establish the IRC cannot be the end of the inquiry under the Elections Clause, as found by the majority, because it also cannot be disputed that any law passed by a state, whether through an initiative or referendum or directly by the legislature, must abide by the United States Constitution.

That the Supreme Court has concluded that the Election Clause properly permits a state to include some other state entity or official in the redistricting process as a limiting check on its legislature's role in that process does not mean that the Elections Clause places no limit on a state's authority to define the legislative process it uses to regulate redistricting. I find it instructive that the scant case law permitting non-legislature entities to participate in the redistricting process, for example *Hildebrant*, 241 U.S. 565, *Smiley* 285 U.S. 355, and *Brown*, 668 F.3d 1271, all involved situations in which the state legislature participated in the redistricting decision-making process in some very significant and meaningful capacity. For example, in *Hildebrant*, the state legislature's congressional redistricting act was rejected by the voters through a referendum; in *Smiley*, the state legislature's congressional districts maps were vetoed by the governor;

1  and in *Brown*, the state legislature created the congressional district maps based on
2  guidelines for redistricting enacted through an initiative.  In short, these cases all
3  involved constraints on the ability of the state legislature to redistrict, and none directly
4  held that the Elections Clause can be so broadly interpreted as to permit a state to remove
5  all substantive redistricting authority from its legislature.  Proposition 106 overreaches
6  under the Elections Clause because the initiative's acknowledged and undisputed purpose
7  was to supplant Plaintiff's constitutionally delegated authority to redistrict by establishing
8  the IRC as Arizona's sole redistricting authority.

9        The majority notes that Proposition 106 does not entirely divest Plaintiff of its
10 redistricting participation inasmuch as it permits Plaintiff to retain some ability to
11 influence the redistricting process.  The majority points out that Plaintiff's majority and
12 minority leaders pick four of the five IRC members and that the IRC is required to
13 consider any modifications to its draft redistricting maps suggested by Plaintiff.  But such
14 minor procedural influences must be evaluated in light of the fact that Proposition 106
15 requires Plaintiff to choose IRC members from a list selected not by it but by the state's
16 commission on appellate court appointments, and the fact that the IRC has the complete
17 discretion not to implement any map changes suggested by Plaintiff.  What Plaintiff does
18 not have under Proposition 106 is the ability to have any outcome-defining effect on the
19 congressional redistricting process.  I believe that Proposition 106's evisceration of that
20 ability is repugnant to the Elections Clause's grant of legislative authority.

21       Dated this 21st day of February, 2014.

                                                        Paul G. Rosenblatt
                                                        United States District Judge